505 So.2d 1371 (1987)
Dorothy ZIMMERMAN, Irvin Einiger, Vinnie Grillo and Bob Defroscia, Appellants,
v.
D.C.A. AT WELLEBY, INC., Appellee.
No. 4-86-1233.
District Court of Appeal of Florida, Fourth District.
April 15, 1987.
*1372 Larry Corman, Broward County Chapter ACLU of Florida, Inc., c/o Hodgson, Russ, Andrews, Woods & Goodyear, Fort Lauderdale, and Alan G. Ehrlich, Broward County Chapter ACLU of Florida, Inc., Plantation, for appellants.
Maurice M. Garcia and Kenneth A. Rubin of Abrams, Anton, Robbins, Resnick, Schneider & Mager, P.A., Hollywood, for appellee.
HERSEY, Chief Judge.
D.C.A. at Welleby, Inc. (DCAWI) obtained a temporary injunction prohibiting appellants, occupants of condominium units in "Winding Lake II at Welleby," in Sunrise, Florida, from continuing certain activities. DCAWI alleged that appellants' conduct constituted defamation and intentional interference with prospective advantageous business relationships. The activities complained of included picketing, displaying signs and talking to potential purchasers of condominium units. We are asked to vacate the temporary injunction.
This problem began when occupants of a number of the apartments in Winding Lake, a condominium built by DCAWI, experienced difficulties with cold, dampness, mildew and odors on various interior walls. The initial efforts of DCAWI to remedy the situation proved fruitless. At the time the present controversy arose, additional remedial action was contemplated by DCAWI, of which appellants were apparently aware.
On two consecutive weekends appellants stationed themselves in proximity to a trailer located at the entrance of the condominium project, which trailer was used by DCAWI as a sales office. Appellants proceeded to walk about carrying signs and speaking to passersby. Signs were also placed prominently in a parked automobile and in the window of one apartment. We glean from the testimony that the signs contained such expressions as: "Open House, See Mildew, Feel Dampness, No Extra Charge, DCA # 1 Blunder:" "Fraud, Deceit, and get asthma;" "Construction, mildew and dampness, beware of DCA."
There was also testimony to the effect that appellants placed themselves in the roadway displaying their signs, talking to people in automobiles and stopping pedestrians and talking to them. Apparently as a result of these activities, some prospective purchasers departed the project without visiting the sales office. There was further testimony that no units were sold on the days when appellants were picketing and that damages from loss of sales were incalculable.
Appellants defended their activities by characterizing them as efforts to convince DCAWI to make the necessary repairs on the condominium units. They also maintain that enjoining these activities infringes upon their right to freedom of speech.
In order to obtain injunctive relief prior to a trial on the merits, a party must show that the activity to be prohibited is causing irreparable harm for which any available remedy at law would be inadequate, and *1373 that a clear legal right exists. Under some circumstances public interest may also be taken into account. Contemporary Interiors, Inc. v. Four Marks, Inc., 384 So.2d 734 (Fla. 4th DCA 1980).
The harm demonstrated by plaintiff below was loss of potential sales. The remedy at law, an action for damages, would be inadequate because of the difficulty in determining how many sales were lost and what the profit on each such lost sale would have been. Thus damages are said to be speculative and unascertainable. The harm is therefore irreparable and the remedy at law inadequate.
The remaining requirement, the existence of a clear legal right, is met by proof to a reasonable certainty of the cause of action stated in the complaint. Appellants' conduct is alleged to constitute tortious interference with an advantageous business relationship. The elements of the tort of interference are:
(1) the existence of a business relationship under which the plaintiff has legal rights, (2) an intentional and unjustified interference with that relationship by the defendant, and (3) damage to the plaintiff as a result of the breach of the business relationship.
Symon v. J. Rolfe Davis, Inc., 245 So.2d 278, 280 (Fla. 4th DCA), cert. denied, 249 So.2d 36 (Fla. 1971). As is further pointed out in Azar v. Lehigh Corp., 364 So.2d 860, 862 (Fla. 2d DCA 1978):
It is not essential, however, that the business relationship be founded upon an enforceable contract. Franklin v. Brown, 159 So.2d 893 (Fla.1st DCA 1964). Thus, in Calvary Church, Inc. v. Siegel, 358 So.2d 1134 (Fla.3d DCA 1978), the court affirmed a judgment against a corporation for interfering with the plaintiff's agreement to purchase property from another even though the agreement was not necessarily enforceable against the seller. Moreover, proof of fraud is not required to sustain a cause of action for this tort. Smith v. Ocean State Bank, 335 So.2d 641 (Fla.1st DCA 1976).
The record in the instant case supports an inference that appellants' picketing with signs and talking to potential customers had a deleterious effect on sales of condominium units. It therefore appears that appellees made a prima facie case in the trial court for the appropriateness of temporary injunctive relief.
As noted earlier, it is appellants' further contention, however, that an injunction under these circumstances interferes with their right of freedom of speech. They argue that this right is of a higher order than appellee's right to seek monetary gain, so that, when these interests are in competition, the right to monetary gain must be considered subservient to the right to communicate.
Both the federal and the Florida constitutions are relied upon by appellants as supporting their position.
The First Amendment to the United States Constitution provides that:
Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech or of the press, or the right of the people peaceably to assemble; and to petition the Government for a redress of grievances.
Article 1, Section 4 of the Florida Declaration of Rights provides:
Every person may speak, write and publish his sentiments on all subjects but shall be responsible for the abuse of that right. No law shall be passed to restrain or abridge the liberty of speech or of the press. In all criminal prosecutions and civil actions for defamation the truth may be given in evidence. If the matter charged as defamatory is true and was published with good motives, the party shall be acquitted or exonerated.
Embellishing upon these constitutional rights, appellants point out that:
Freedom of speech and of the press are among the fundamental personal rights and liberties which are protected by the First Amendment and secured to all persons by the Fourteenth Amendment against invasion or suppression by state action. NAACP v. Clairborne Hardware *1374 Co., 458 U.S. 886, 102 S.Ct. 3409, [73 L.Ed.2d 1215] (1982); Organization for a Better Austin v. Keefe, 402 U.S. 415, 91 S.Ct. 1575 [29 L.Ed.2d 1] (1971); New York Times Co. v. Sullivan, 376 U.S. 254, 84 S.Ct. 710 [11 L.Ed.2d 686] (1964); Marsh v. Alabama, 326 U.S. 501, 66 S.Ct. 276 [90 L.Ed. 265] (1946); Thomas v. Collins, 323 U.S. 516, 65 S.Ct. 315 [89 L.Ed. 430] (1945); Jamison v. Texas, 318 U.S. 413, 63 S.Ct. 669 [87 L.Ed. 869] (1943); Thornhill v. Alabama, 310 U.S. 88, 60 S.Ct. 736 [84 L.Ed. 1093] (1940); Schneider v. State, 308 U.S. 147, 60 S.Ct. 146 [84 L.Ed. 155] (1939); Hague v. CIO, 307 U.S. 496, 59 S.Ct. 954 [83 L.Ed. 1423] (1939); Lovell v. Griffin, 303 U.S. 444, 58 S.Ct. 666, [82 L.Ed. 949] (1938). There are few things more established in our jurisprudence than that these freedoms are sacred and inviolable. These provisions command that the right to speak and express oneself freely may not be restrained, curtailed, or abridged. Such constitutional commands, being those of a liberty-loving society, must be of the broadest possible scope.
There can be no question of the preeminence that the courts have appropriately given to first amendment rights. Encroachments on the freedom to speak one's mind are seldom tolerated and are narrowly confined. This is particularly true when injunctive relief constituting prior restraint on some form of communication is involved. In such cases the restraint is said to bear a heavy presumption of constitutional invalidity, even though the communication in issue may be false. Truth or falsity of the expression sought to be enjoined is not in issue. Austin, 402 U.S. at 418, 91 S.Ct. at 1577. The constitutional protection does not turn upon "the truth, popularity, or social utility of the ideas and beliefs which are offered." N.A.A.C.P. v. Button, 371 U.S. 415, 445, 83 S.Ct. 328, 344, 9 L.Ed.2d 405 (1963).
Does it therefore follow that freedom of speech is an absolute right, one that cannot under any circumstances be curtailed or conditioned? Precedent and common sense indicate not. Indeed, the Florida constitutional provision contains its own limitation. One may speak, but not with impunity. The difficulty lies not so much with determining whether a particular communication constitutes an abuse, but whether the abuse is one which justifies injunctive relief. As we have seen, any prior restraint is presumptively flawed. The cases offer no clear path to decision but do provide blazes along the trail.
First, a distinction has been made between pure speech and what is sometimes designated as "commercial speech." Business rivals may, of course, engage in competitive advertising and other activities designed to improve one's economic position at the expense of the other. In such a case the test of whether conduct is abusive (and therefore legally improper) is whether it would be considered "unfair" according to contemporary business standards. In Azar v. Lehigh Corp., 364 So.2d at 862, a temporary injunction prohibiting a real estate salesman from entering upon premises of his former employer to solicit customers to purchase real estate was upheld, the court, through Chief Judge Grimes, pointing out that:
There is a narrow line between what constitutes vigorous competition in a free enterprise society and malicious interference with a favorable business relationship. Under the heading of `Interference with prospective advantage,' Prosser states:
Though trade warfare may be waged to the bitter end, there are certain rules of combat which must be observed.... W. Prosser, Law of Torts (4th ed. 1971) at 956.
He goes on to say that the courts have generally prohibited such activities as defamation of the competitor, disparagement of his goods and his business methods, and intimidation, harassment and annoyance of his customers. In the final analysis, the issue seems to turn upon whether the subject conduct is considered to be "unfair" according to contemporary business standards.
While petitioner and respondent are not business rivals, there is a parallel to be *1375 drawn from the fact that both have economic benefit at stake. It is not insignificant that petitioners' primary motive is to gain an economic benefit for themselves (repair of the units) rather than communication for any educational or altruistic or philanthropic purpose. We do not denigrate petitioner's motivation, but are simply placing it in proper perspective.
A second distinction that is made concerns any communication which is defamatory but which is uttered or published incident to another tort. Defamatory words uttered in aid of another tort are said to constitute "verbal acts." This court, in DeRitis v. AHZ Corp., 444 So.2d 93 (Fla. 4th DCA 1984), relied upon this distinction in affirming the issuance of a temporary injunction, although remanding with instructions to narrow the prohibitions of the order imposing the injunction. That case involved signs and other forms of communication which disparaged the developer of a condominium. By frustrating sales, the dissatisfied owners of units sought to coerce the developer into repurchasing their units, giving them a $12,000 profit. Approval of prior restraint was supported by citation to Azar, 364 So.2d 860, and the New York cases of West Willow Realty Corp. v. Taylor, 23 Misc.2d 867, 198 N.Y.S.2d 196 (Sup.Ct. 1960), appeal dismissed, 10 A.D.2d 1002, 205 N.Y.S.2d 810 (N.Y.A.D.2d Dept. 1960) and Wolf v. Gold, 9 A.D.2d 257, 193 N.Y.S.2d 36 (N.Y.A.D. 1 Dept. 1959), appeal denied, 10 A.D.2d 561, 196 N.Y.S.2d 600 (N.Y.A.D. 1 Dept. 1960). A Pennsylvania case also referred to in DeRitis was reversed on appeal.
The court in West Willow, conceding that equity will not ordinarily intervene to restrain the alleged libel or slander of a person, his property or his business, concluded:
Where, however, statements which are libelous or slanderous with respect to a person, his property or business, are published or made as a part and parcel of a course of conduct deliberately carried on to further a fraudulent or other unlawful purpose, a court may grant injunctive relief to prevent irreparable injury. 198 N.Y.S.2d at 198.
In Wolf v. Gold, 193 N.Y.S.2d 36, also supportive of injunctive relief in such circumstances, the court points out that equity appropriately intervenes to restrain the publication of defamatory words where such publication is merely incident to other tortious conduct. More specifically: "Defamatory words uttered in aid of another tort are verbal acts, which, with the aided tort, are subject to restraint, if equitable grounds therefor are present." Id. 193 N.Y.S.2d at 38.
Another distinction recognized in the case law is that, while picketing is recognized as a form of communication, it is to be distinguished from pure speech. Legal consequences arising from application of this distinction are outlined by the court in Hughes v. Superior Court of the State of California, 339 U.S. 460, 70 S.Ct. 718, 94 L.Ed. 985 (1950), excerpts from which we extract in the form set out in appellee's reply brief:
While picketing is a mode of communication, it is inseparably (sic) and something more and different. Industrial picketing `is more than free speech, since it involves patrol of a particular locality and since the very presence of a picket line may induce action of one kind or another, quite irrespective of the nature of the ideas which are being disseminated....' Publication in a newspaper, or by distribution of circulars, may convey the same information or make the same charge as do those patrolling the picket line. But the very purpose of a picket line is to exert influences, and it produces consequences, different from other modes of communication. The loyalties and responses evoked and exacted by picket lines are unlike those flowing from appeals by printed word. Id. at 464-465, 70 S.Ct. at 720-21.
The Court further noted that:
It has been amply recognized that picketing, not being the equivalent of speech as a matter of fact, is not its inevitable legal equivalent. Picketing is not beyond the control of a state if the manner in which *1376 picketing is conducted or the purpose which it seeks to effectuate gives ground for its disallowance. Id., at 465, 466, 70 S.Ct. at 721, 722.
We also note that picketing pursuant to specific statutory authority in the context of labor-management relations calls into play slightly different considerations than those which apply to picketing not similarly sanctioned by legislative enactment.
As previously noted, appellants' activities had an adverse influence upon sales of appellee's units. The admitted purpose of that activity was to coerce appellees into making certain repairs to units owned by appellants. The parties are not business competitors, although the economic interests of both are involved. The complained-of activity includes both picketing and verbal acts; therefore it does not constitute pure speech.
The ultimate issue in this case is whether the prior restraint (or censorship) imposed was justified because of the type of defamation involved. "It is a fundamental principle, long established, that the freedom of speech ... secured by the Constitution, does not confer an absolute right to speak or publish, without responsibility, whatever one may choose... ." Gitlow v. People of State of New York, 268 U.S. 652, 666, 45 S.Ct. 625, 630, 69 L.Ed. 1138, 1145-1146 (1925).
We approve the trial court's finding that some of the activities enjoined constitute or are incident to conduct which constitutes intentional interference with potentially advantageous business relationships, and that the rights thus tortiously violated are entitled to be protected by equitable intervention in the form of a temporary injunction.
On the other hand, some of the prohibited activities fall within the ambit of first amendment protections and are not subject to prior restraint whether or not those activities are tortious.
Accordingly, to the extent that paragraphs "A" and "E" of the injunction prohibit peaceful picketing and the displaying of signs, posters or other graphic material, we disapprove them and, upon remand, those prohibitions shall be stricken from the temporary injunction.
In all other respects, and including the amount fixed for bond, we affirm.
AFFIRMED IN PART; REVERSED IN PART; REMANDED.
ANSTEAD, J., concurs.
GLICKSTEIN, J., concurs specially with opinion.
GLICKSTEIN, Judge, concurring specially.
I have no desire to detract from my colleague's opinion. He gave this case a long, hard look and kept an open mind before coming down as he has; and I concur with his views. These observations, then, are meant to serve as a trailer only.
As the author of DeRitis v. AHZ Corporation, 444 So.2d 93 (Fla. 4th DCA 1984), I believed then, and believe now, that injunction must be available to protect us all from those whose conduct goes over the line of acceptability based on well-recognized, objective criteria. In that case, we were concerned, as here, with on-site corralling of customers by the distressed unit owners and attendant bad mouthing of the product. Moreover, here we have an owner coming up to the sales representative and prospective customers and asking the representative if he had told the prospects about the mildew. An injunction should be available to prevent such conduct. It is no wonder that sales went to zilch.
DeRitis, however, did not involve picketing, which was also involved here. DeRitis is also distinguishable with respect to signs in windows, normally protected conduct. There, the condominium documents regulated signs on the property.
The picketing issue has been an education for this writer. The Hughes decision, quoted in the majority opinion, was authored by Justice Frankfurter, who was as concerned  as a member of the Supreme Court  with the purpose of peaceful picketing as the judge on temporary assignment to the Chancery Division of the *1377 Superior Court of New Jersey who wrote the opinion in Pebble Brook, Inc. v. Smith, 140 N.J. Super. 273, 356 A.2d 48, 51 (1976), saying:
On the record before this court we cannot say that defendants' activities are obviously designed to coerce and intimidate the Moldoff interests into settling their claims for money damages, as could the New York court in the West Willow case. See discussion in Annotation, "Consumer Picketing," 62 A.L.R.3d 227, 238 (1975).
After reading Hughes, I returned to Brandeis and Frankfurter, A Dual Biography, by Leonard Baker, Harper & Row, (1984), to see what it might say about picketing. In the chapter entitled "The Harvard Professor and the Alabama Hillbilly," the Pulitzer Prize winning author wrote:
Felix Frankfurter on the Court had not changed much from the Felix Frankfurter of the years before the Court, still arguing for local responsibility and against the Court's imposing its will on reasonable local action.
He showed this again, in another labor case, one from Texas. A man named Ritter hired a contractor to build a building. When the contractor used nonunion help, the carpenters' union picketed  not the construction site, however, but a restaurant owned by Ritter some distance away. The restaurant employees were union members and not involved with the dispute over the building's construction. The restaurant's business dropped 60 percent. The state courts ruled against the union, and Frankfurter, speaking for the Supreme Court in 1942, supported the state courts.
Conceding that peaceful picketing was an exercise of free speech, Frankfurter said that "does not imply that the states must be without power to confine the sphere of communication to that directly related to the dispute." The minority decision, written by Black, joined by Douglas and Murphy, criticized Texas for frustrating the "union's objective of conveying information to that part of the public which came near the respondent's place of business."
In that case the dispute between Frankfurter and Black was visible. Black called on logic, maintaining that if peaceful picketing was an expressing of free speech, guaranteed by the First Amendment, then an absolute was involved and an absolute could not be restricted. Frankfurter called on experience, arguing that the state had not lost all police power to the First Amendment  "To deny to the states the power to draw this in is to write into the Constitution the notion that every instance of peaceful picketing  anywhere and under any circumstances  is necessarily a phase of the controversy which provoked the picketing."
Three years later, the Black group had its fun with Frankfurter in Hunt v. Crumboch. A union, angered at an employer, refused to enroll his employees and then pressured his customers not to deal with him. When the union's action threatened to drive the man out of business, he sued the union. The Supreme Court upheld the union. The decision, by Black, found its justification in quoting Frankfurter's opinion in the St. Louis brewery case  "So long as a union acts in its self-interest and does not combine with non-labor groups."
Id. at 430, 431.
One final word about DeRitis: not only was Mazzacone v. Willing, 246 Pa.Super. 98, 369 A.2d 829 (1976), cumulative, it was erroneously cited having been reversed at 482 Pa. 377, 393 A.2d 1155 (Pa. 1978). My colleague thoughtfully omitted to mention my oversight therein.